ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. COLE.

(Court of Civil Appeals of Texas. Texarkana. June 12, 1913. On Motion for Rehearing, July 3, 1913.)

1. TRIAL (§ 140*) — QUESTIONS FOR JURY — CREDIBILITY OF WITNESSES — IMPEACHMENT —EFFECT.

It cannot be said, as a matter of law, that the testimony of a witness who has been impeached should be entirely disregarded, even though it be shown that he is utterly unworthy of belief.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 334, 335; Dec. Dig. § 140.*]

2. APPEAL AND ERROR (§ 1001*)—REVIEW— VERDICT—SUFFICIENCY OF EVIDENCE.

As a general rule appellate courts will not disturb verdicts, when there is any credible evidence on which they might be based.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3922, 3928–3934; Dec. Dig. § 1001.*]

3. APPEAL AND ERROR (§ 1175*)—REVERSAL— RENDERING FINAL JUDGMENT—NECESSITY FOR NEW TRIAL—VERDICT AGAINST WEIGHT OF EVIDENCE.

Appellate courts cannot reverse and render judgment because the verdict is against the great preponderance of the evidence, but they may reverse and remand the case for a new trial.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4573–4587; Dec. Dig. § 1175.*]

4. TRIAL (§ 252*)—INSTRUCTIONS—APPLICABILITY TO EVIDENCE.

An instruction that submits to the jury facts not presented by the evidence is improper.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. § 252.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

On Rehearing.

5. DAMAGES (§ 185*)—PERSONAL INJURIES—SUFFICIENCY OF EVIDENCE — DISEASE RESULTING FROM INJURY.

In an action by a brakeman for personal injuries, evidence *held* insufficient to show that a disease of the kidneys from which the brakeman was suffering was the result of his fall from the train.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 503–508; Dec. Dig. § 185.*]

Appeal from District Court, Bowie County; P. A. Turner, Judge.

Action by Charles G. Cole against the St. Louis Southwestern Railway Company of Texas. Judgment for the plaintiff, and defendant appeals. Reversed and remanded.

Glass, Estes, King & Burford, of Texarkana, for appellant. Graham & Smitha, of Texarkana, for appellee.

HODGES, J. In December, 1912, Charles G. Cole, the appellee, recovered a judgment in the district court of Bowie county for $12,000 against the appellant, as damages for personal injuries. It is alleged in the plaintiff's original petition that on the 27th of October, 1911, he was in the appellant's service as a freight brakeman, and that, while walking on the running board of the train with which he was connected, he fell and sustained the injuries for which he sued. The negligence relied on is thus stated in the petition: "That the defendant, its agents, and employés had permitted, placed, and caused to be placed a car in said train, the running board of which was loose, decayed, split, and broken; said car also had upon its top certain loose planks, scantling, and poles, which obstructed the running board of said car; that the running board was on the top of said car, and it is customary and required to be placed on all cars entering into trains; the same being placed there for the purpose of being used as a walkway by the plaintiff and others in walking on such train." It is further alleged that, while the plaintiff was passing from the rear of the train to the front, walking along this running board, some portion of the loose material lying on the car "or of the running board" caught his pants at his foot, and he was thereby caused to fall from the top of the car to the ground; that the fall resulted in serious bodily injuries, which are set out in detail in the petition. He asked for a judgment for $25,000.

The testimony shows that Cole entered the service of the appellant railway company as a brakeman in August, 1911; that on the night of October 27th the freight train with which he was connected left Waco for Tyler between 8 and 9 o'clock. The train consisted of about 38 cars, among which were several called "camping outfit cars." These were placed in the train near the engine. Besides the engineer and fireman, the train crew consisted of C. E. Murphy, the conductor, E. S. Plasterer, the rear brakeman, and the appellee, Cole, who was the head brakeman. There was lying on the top of one of these "outfit cars" some 2x4 lumber 16 or 18 feet long, and probably some other material, designed for use in handling hand cars. These "outfit cars" were to be set out of the train at Axtell, the next station, which was about 10 or 12 miles from Waco.

Cole testified that soon after the train left the Waco station he was directed by the conductor to go to the front of the train and notify the engineer that the "outfit cars" were to be left at Axtell; that in obedience to this order he climbed on the top of the train and started to the front, walking along on the running board in the usual way. The train was at the time traveling at the rate of about 10 or 12 miles per hour. When he reached these "outfit cars," and while passing over one of them, the cuff of his pants was caught by some obstruction, which caused him to fall from the car to the ground. He testified: "After I had got pretty close to the engine—that is, three or four cars from the engine—something caught my pant leg, or foot, and kinder threw me forward like, and I went to regain my balance, and I fell backward, and fell off the car on the right side of the track—that is, the engineer's side. * * * I could not describe the obstruction on the running board that caught me, but it was either a plank or stick caught my leg and caused me to lose my balance. It happened in an instant, and I couldn't give an accurate description of it. I had not seen the obstruction before I was caught. I had no occasion to go on the train before that. * * * Just as my pants caught on something I observed some obstruction on the running board; it was either planks or poles, but, as I said a while ago, I am unable to give an accurate description because I was just going over the train as I always do."

On cross-examination his attention was called to answers made by him when his deposition was taken on a previous occasion, and the following is shown by the record: "Q. But you said you went to step over the obstructions. A. Yes, sir; I say so now. Q. Well, if you went to step over them, you saw them, didn't you? A. I said before this thing caught my pant leg when I went to step over the obstruction. Q. You state here that you went to step over the obstruction, and while stepping over your pants legs caught? A. I swore that, yes, sir; but I didn't explain as fully there as I intended to explain now." He further stated that he was rendered unconscious for a time by the fall; that he received injuries on his head, shoulders, body, legs, arms, and back; that he lay upon the ground some time before he regained consciousness. The place where he fell was about a mile from the East Waco Depot. When he regained consciousness he discover-

ed by the lights the direction of the depot, and walked back to the tower house. He there called upon the operator for assistance, and was assisted to go up into the latter's room, which was upon an elevated platform, and remained there for something like a half hour. He was then taken to a hotel, where he was examined by one of appellant's surgeons. On the next morning he was sent to Tyler, and there examined again by another railway surgeon. From Tyler he was sent to the railway hospital at Texarkana, where he was under treatment about 20 days. After leaving the hospital he remained in Texarkana five or six weeks, and during a part of that time was under the treatment of Drs. J. K. Smith and W. E. Womack, physicians of his own selection, and who testified in his behalf in the trial below. He afterwards went to his old home in Allensville, Ky., where he remained about three months, and while there was examined by Dr. J. L. Farmer.

At the time of the trial in the court below Cole claimed that he was still suffering from an injury to his kidneys. He testified as follows: "As far as I could see the effect that injury had on me was that there was pus and blood in my urine, when I would urinate. I first began to pass pus and blood while in the Cotton Belt Hospital; I only noticed the blood at first. I could not tell just what proportion of the urine was pus or blood. It was in sufficient quantities so that I could see it with my eyes. That condition and the flow of that description is continuing now. I think I noticed it this morning. My condition all this time has been such that I suffer a great deal, especially at night." Cole further testified that he was unable to perform any heavy manual labor, and that riding on trains would cause him pain.

Conceding that the appellant was guilty of the negligence charged, and that Cole has since that time been suffering from pyelitis or some form of kidney disease as claimed by him, the further question arises, Is the evidence sufficient to justify a finding that the negligence attributed to appellant was the real cause of that disorder? In other words, did Cole in fact fall from the train as stated by him? Or, if he did, are the injuries from which he has since suffered the result of that fall? The burden rested upon Cole to produce evidence sufficient to warrant an affirmative answer to all of these questions, and unless he has done so the verdict should not be permitted to stand.

The only evidence adduced to prove that Cole did fall from the train, as alleged, is his own testimony. No other person witnessed the occurrence, or discovered him in a situation which could be considered as corroborative of his statements concerning such a fall. It is true a broken lantern was found by another brakeman some time afterward near the place where Cole says he fell, but the conclusion that this was the lantern carried by Cole on that occasion, and that it was broken as the result of the fall, and not intentionally for the purpose of deception, must depend upon Cole's own testimony. There was much evidence introduced tending to impeach Cole's veracity. It was shown by his own admissions that in 1910, while treasurer of a local railway organization in Tennessee, Cole was found short in his accounts to the amount of over $900; that a criminal charge was thereafter preferred against him, upon which he was arrested and lodged in jail; that he afterwards procured the money necessary and made the shortage good, and he was then discharged. In explaining how the shortage occurred he testified that after drawing the money from the bank in which it had been deposited he was passing a saloon and was invited in by some acquaintances, with whom he took a drink of liquor. He then walked to the rear end of the building and sat down and soon lost consciousness. When he awoke he was in his own room, and the money was gone. He admits that he had been drunk, and endeavors to leave the impression that he was robbed while in that condition.

Of course, such an occurrence as that detailed here is possible, but it has so often been used as a subterfuge by those who really intend to perpetrate a fraud that it is now of doubtful utility in accounting for the disappearance of trust funds. He also admitted that in February, 1911, a few months prior to his entry into the service of the appellant, he was in the employ of the Missouri, Kansas & Texas Railway Company in Oklahoma, and while attempting to mount a car fell and sustained painful injuries to his head and back and over the region of his kidneys. He afterwards compromised a claim against that railway company for damages resulting from those injuries for the sum of $1,000. On cross-examination in the trial below he denied that while in the hospital at Sedalia, Mo., suffering from those injuries, he had written a letter to an attorney in Denison instructing him to file a suit against the Missouri, Kansas & Texas Railway Company for damages, in which letter he referred to his then existing injuries, and claimed that they were serious and painful. The evidence contradicting him upon that issue is very strong indeed. Cole also admitted that in August, 1911, a few months after settling with the Missouri, Kansas & Texas Railway Company, he made a written application for employment in the appellant's service, and that in that application he intentionally suppressed the fact that he had been injured while in the service of the Missouri, Kansas & Texas Railway Company; that he did this because he had been informed that if it was known to the appellant's officers that he had ever been in the service of that company he would be rejected. He claims that when he made this application he had entirely recovered from

his Oklahoma injury; that he underwent at the hands of a surgeon employed by the appellant a thorough physical examination, including an examination of his kidneys and a test of his urine. As to this latter fact he is contradicted by the examining physician himself, and circumstantially by the blank application filled out at the time, and which does not indicate that such an examination was made or required.

[1] It cannot be said, as a matter of law, that the testimony of a witness whose veracity has been impeached should be entirely disregarded, even though it be shown that he is utterly unworthy of belief. Impeaching evidence is to be considered by the jury or the court only in determining what weight should be given to the testimony of the witness upon the particular occasion. If the grounds for discrediting Cole's testimony concerning his fall and the injuries claimed were limited to this impeaching evidence alone, there would not be sufficient reason for disturbing a finding of fact based exclusively upon his testimony. But there are other facts which tend strongly to negative the truth of his statements. The railway surgeon who examined Cole within a few hours after the time he says he was injured testified that he found no external evidences of a fall. Dr. J. K. Smith, who examined him about 20 days later, testified to the same effect. In fact, there seems to be no pretense that any such external evidences ever existed upon Cole's body. It may be possible that he could fall from the top of a freight car while moving at the rate of 10 or 12 miles an hour, strike the ground with such force as to render him unconscious for several hours thereafter, and yet receive no wounds or bruises on the surface of the body visible to the eye of an experienced surgeon. But in our opinion such an occurrence is so improbable that the absence of such external indications of a fall should be regarded as strong evidence that none did in fact occur. When we consider the fact that Cole did not scruple to suppress the truth when seeking employment at a time when he thought it to his interest to do so, it is taxing credulity to believe he would be more truthful when he had thousands of dollars at stake, and was testifying to facts concerning which he could not be contradicted by others, and under circumstances where the falsehood could not be exposed. In this state of the record it is difficult to understand why so much credence was given by the jury to Cole's testimony, and so little to the facts and circumstances which tended to contradict him.

But assuming that a finding by the jury that Cole fell from the car, in the manner described by him, should not be disturbed because of a mere conflict in the evidence, there is another important fact which must also have been determined in his favor. Before a verdict could have been rendered for him it was necessary to find that the disease from which Cole was suffering resulted from that fall. If that disorder could not be legally attributed to the fall the other injuries are too slight to warrant a verdict for $12,000. In passing upon this particular issue it may be accepted as true that Cole was a sick man from the time he left the hospital at Texarkana till he withdrew from the treatment of his physicians, and that he had traces of the disease at the time of the trial. Still, we do not think the evidence is sufficient to support the finding that his injuries resulted from the alleged fall. Dr. Smith, who testified for him upon the trial below, states that when he examined Cole he seemed at the time to have been suffering from renal colic—stones in the kidneys. He gave it as his opinion that his disease was pyelitis, or inflammation of the pelvis of the kidneys; that this condition might result from a traumatic injury or from the accumulation of stones in the kidneys. When given a history of the injury received by Cole in Oklahoma in February, 1911, and that of which he complains in this suit, Dr. Smith stated that his condition might be attributed to either injury. He said: *"The symptoms that he (Cole) had indicated stones or foreign substance in the kidney as much as anything else—in fact, more than anything else."* (Italics ours.) Dr. Smith also testified that he told Cole of two or three tests by which it could be definitely ascertained whether or not he had stones in the kidneys, one of which was by the use of the X-ray—a simple and speedy method—but that Cole did not agree to submit to any of them. Dr. Farmer of Allensville, Ky., under whose treatment Cole placed himself after his return to that state, testified that he made a close examination of Cole, and discovered pus and blood in his urine, but that he did not know what caused the trouble. On cross-examination he said: "It is a fact that when I was treating Cole I could not be positive whether he was suffering from hemorrhage from the kidneys or bladder. I was not able from the examination I made of him to determine positively the diagnosis of the case, and I insisted on Cole going with me to Nashville, Tenn., and have a shadowgraph made of the parts affected, and I told Cole that with an examination of that kind I could determine positively as to the diagnosis. The symptoms that Cole had were such as often indicate the existence of renal colic, and were such as would usually indicate that he had some foreign substance in one or both of his kidneys. A foreign substance in the kidneys will produce renal colic. Renal colic, or foreign substance in the kidneys, will produce hemorrhage of the kidneys." It is conceded that Cole also declined to accompany Dr. Farmer to Nashville for the purpose of having the examination referred to made. The evidence presents this situation: The appellee has a local disorder, designated by the term "pyelitis," or inflammation of the pelvis of the

kidneys. Dr. Farmer states that it might be an affection of the bladder only. Pyelitis, according to the experts, may be attributed to either of two possible causes—a fall from the car, or the presence of some foreign substance in the kidneys. Taking the testimony of the appellee's own witnesses, the physicians whom he had selected to treat him, two of them, Drs. Smith and Farmer, are more inclined to attribute his disorder to a cause other than the fall—the presence of some foreign substance—while the other, Dr. Womack, merely says that it might be attributed to a fall such as that which Cole describes. The fact that Cole declined to avail himself of an opportunity to have an examination made that would disclose the true cause of his trouble is not without significance in the determination of a question about which he probably knows much more than others. While the jury are the judges of the facts, they have no right to arbitrarily decide such issues without a proper regard to legal evidence upon which they should rely in forming their conclusions. In concluding that Cole's injuries were attributable to the fall from appellant's train, and not to the presence of stones or some foreign substance in the kidneys, the jury, we think, decided against the great weight of the evidence.

[2, 3] It is the general rule in appellate courts to leave the verdicts of juries undisturbed, where there is any credible evidence upon which they may be based. Such courts have not the right to reverse and render a judgment because the verdict is against the great preponderance of the evidence, but they can reverse and remand for a new trial. Irving v. Freeman, 155 S. W. 931. After carefully reading the statement of facts contained in this record, we are so thoroughly impressed with the belief that the verdict rendered in this case is wrong that we feel that an affirmance of the judgment would be a dereliction of duty. To dismiss this question with the mechanical dictum that there was some evidence to sustain the finding of the jury would probably be in line with some precedents, but in this instance would, we feel, be the evasion of a primary obligation resting upon all appellate courts—to reverse a judgment for errors which affect the substantial rights of the parties.

[4] Complaint is made of the following portions of the court's charge: "If you believe from the evidence that the running board on one of the cars in the train on which plaintiff was brakeman was broken or out of repair, etc., * * * that such running board was, by reason thereof, not in a reasonably safe condition for use, and that its condition was due to failure of the defendant to use ordinary care to put said running board in a reasonably safe condition for use and to keep it in such condition, and if you further believe from the evidence that the plaintiff, while in the discharge of his duty as brakeman, was walking on said running board, and the leg of his pants caught in said running board or some obstruction on it or near it, and that his pants leg caught because of the defective condition of the same, and that he was thereby thrown down and fell off said car and was hurt, then you will find for the plaintiff; unless you find for the defendant on the ground of assumed risk under subsequent paragraphs of this charge. However, if you believe from the evidence that the running board of the car was broken or out of repair so it was not reasonably safe for use * * * still, if you believe from the evidence that plaintiff knew the condition of said running board, or could and would have known of its condition if he had used that ordinary circumspection which an ordinarily prudent man would have used in the particular employment of a freight brakeman, and with said knowledge he undertook to use and did use said running board and was hurt, then he assumed the risk and can't recover, and you will find for the defendant." The specific objection to this charge is that it submits facts not presented in the evidence. A fair construction of the appellee's testimony as to how he happened to fall makes it clear that the bottom of his pants leg was caught by some obstruction lying on the running board, and was not the result of its broken condition or of its being out of repair. While this error might be technical, and one which should not ordinarily be considered sufficient to justify the reversal of a judgment, otherwise unassailable, it is difficult to say it did not in this instance have some influence in causing a verdict which we consider at variance with the great weight of the evidence.

The assignments not discussed are overruled.

The judgment is reversed, and the cause remanded for another trial.

### On Motion for Rehearing.

[5] In view of another trial, and in order to prevent any misapprehension from what was said in the original disposition of this case, we expressly disclaim any purpose of passing upon the admissibility of what is referred to as testimony tending to impeach the credibility of the appellee as a witness. All of that testimony appears in the record as having been admitted without objection. It is adverted to merely as a part of the history of the case, and as indicating the great leniency extended by the jury to the appellee in passing upon evidence introduced in his behalf. Whatever may be said as to the admissibility of specific acts tending to show dishonesty and moral depravity, as a method of impeaching a witness, when met by some appropriate objection, it is difficult to understand why such conduct, when confessed by the witness himself on cross-examination, and admitted in evidence without

objection, may not be considered in passing upon his credibility. But in reaching the conclusion that the verdict rendered in this case was without proper support we are not required to pass upon the effect of impeaching evidence, or to settle a conflict in the testimony. A careful analysis of the evidence elicited from the appellee's own witnesses convinced us that he had failed to discharge the burden which the law placed upon him to make out a case for the liberal sum recovered.

Under the pleadings the appellee assumed the burden of proving at least three essential facts in order to justify the damages awarded: (1) Negligence on the part of the railway company in failing to keep the running board of the train in proper condition; (2) that this failure caused the appellee to fall from the train; (3) that the injuries to his kidneys resulted from that fall. We are frank to concede that whatever may be said of what is offered in the record as impeaching evidence, or of the conflicts between Cole and other witnesses upon issues of fact, we should not feel justified in disturbing the findings of the jury in his favor as to the negligence charged and the fall from the train. Proof of the remaining fact—that his kidney disease was due to that fall—is just as important as either of the others. Upon this issue Cole could only say that his symptoms developed after his fall. He was not an expert, and could not be expected to distinguish a mere sequence from a physical consequence. For proof that the fall did cause the injury we must look to the testimony of the attending physicians. One of these, Dr. Farmer, who testified by deposition, expressed no opinion favorable to the appellee upon that issue. Another, Dr. Womack, also testified by deposition. What he said is sufficiently set forth in the original opinion, and need not be here repeated. Dr. J. K. Smith, another of Cole's physicians, treated him longer and observed him more closely than either of the others. He testified orally for Cole upon the trial, and at considerable length. We here give extracts from his testimony which we think sufficiently disclose his opinion as to the cause of Cole's injury: "If the plaintiff here had permitted me to make any of the tests that I suggested to him, by which I could really tell what was the matter or what caused his trouble, and I had found that it was stone or some other foreign substance, then I would not have attributed the trouble to either of those injuries any more than they might have irritated it. It would not have taken any history at all. By the X-ray test you could tell whether it was stones or not, and I suggested that test, but he did not agree to that. If there is foreign substance in the kidneys such as I have been operating on and taking out of the kidneys recently, it is not produced from an injury, but from a diseased condition of the mucous membrane, something started in the process of crystallization. In severe cases of renal colic I always attribute it to stones until I negative it by other examinations. I always do until I can find out. Of course, it is not always so, so far as that is concerned. It is not as severe when it is produced by blood as when it is produced by stones. The symptoms that he had indicated stones or foreign substance in the kidney as much as anything else, in fact more than anything else. The reason I suggested it was because he had had no previous attacks, you know. Stones are a long time in forming; they are of slow growth. The symptoms I discovered might be caused by tuberculosis. That is a disease of the kidneys that causes blood and pus to come out. * * * The symptoms of the plaintiff indicated more than anything else stones or foreign substance in the kidney."

How a jury, uninfluenced by prejudice or sympathy, could under such evidence find in favor of the appellee upon that particular issue is not easily understood. We fully appreciate the deference with which our courts are accustomed to treat the findings of fact embraced in the verdicts of juries, and we have no inclination to depart from the well-established rule. In the case of Irving v. Freeman, cited in the original opinion, the Supreme Court said: "It is settled in this court that a court of civil appeals can reverse a judgment of the district court when against the preponderance of the evidence, and remand the case." The law does not lodge such power for nothing, but it is contemplated that in a proper case it will be exercised. A failure to set aside a verdict, when the facts justify the conclusion on the part of an appellate court that an injustice has been done the defendant, would be as gross a dereliction of duty as to inconsiderately disturb a verdict for the plaintiff.

We have again, in response to the arguments presented in the motion for a rehearing, carefully gone over the evidence, and are still of the opinion that the ends of justice demand the reversal of the judgment rendered in this case. The evidence before us warrants the conclusion that not only was there a great preponderance against the appellee, but it is difficult to find sufficient for even the most partial mind to justify the findings of the jury upon the last and important issue involved. The record also justifies the conclusions that there were some facts material to be considered about which the jury upon the first trial were left to conjecture, but which it is possible to reduce to greater certainty upon another trial.

The motion for a rehearing is overruled.